895 F.2d 58
 58 Ed. Law Rep. 897, 28 Soc.Sec.Rep.Ser. 449,
Medicare&Medicaid Gu 38,374
 Melissa DETSEL, a handicapped child, by her mother, Mary Jo
DETSEL, Plaintiff-Appellant,
v.
Louis SULLIVAN, M.D., as Secretary of the U.S. Department of
Health & Human Services, Cesar Perales, as Commissioner of
the N.Y. State Department of Social Services, Stefan Bandas,
as Commissioner of the Cayuga County Department of Social
Services, Defendants-Appellees.
 No. 164, Docket 88-6227.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 2, 1989.
Decided: Feb. 1, 1990.
 
 Lewis A. Golinker, Legal Services of Central New York, Inc., Syracuse, N.Y., for plaintiff-appellant.
 Elizabeth Dusaniwskyj, New York City, Asst. Regional Counsel, U.S. Dept. of Health and Human Services, (Annette H. Blum, Chief Counsel of Dept. of Health and Human Services, New York City of counsel), for defendant-appellee Louis W. Sullivan. M.D., Secretary of U.S. Dept. of Health and Human Services.
 Robert A. Forte, New York City, for defendant-appellee Cesar Perales, Commissioner of the New York State Dept. of Social Services.
 Frederick R. Westphal, Auburn, N.Y., for defendant-appellee Stefan Bandas, Commissioner of the Cayuga County Dept. of Social Services.
 Miriam Berkman, New Haven, Conn. (Stephen Wizner, J.L. Pottenger, Jr., Mary McCarthy, Jerome N. Frank Legal Services Organization, New Haven, Conn., of counsel, William Dodge, Andrew S. Golub, Student Counsel, on the brief), for Jerome N. Frank Legal Services Organization, Council for Exceptional Children, National Ass'n of School Nurses, and Ass'n of Rehabilitation Nurses, amici curiae.
 Leslie Salzman, New York City (Herbert Semmel, New York City, New York Lawyers for the Public Interest, Inc., of counsel), for New York State Com'n on Quality of Care for the Mentally Disabled, Association for Retarded Citizens of the U.S., Center for Law and Educ., Inc., Disability Rights Education and Defense Fund, Federation for Children with Special Needs, National Ass'n of Protection and Advocacy Systems, Inc., National Network of Parent Centers, New York State Ass'n for Retarded Children, Inc., New York State Nurses Ass'n, SKIP of New York, Inc., and the Center on Human Policy, amici curiae.
 Before NEWMAN, PRATT, and MAHONEY, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 This appeal presents a novel issue under the Medicaid program. We must decide whether a handicapped child who receives Medicaid-covered nursing services 24 hours a day in her home can reasonably be denied those services during the time she attends public school. According to the Secretary of Health and Human Services, denial is compelled by 42 C.F.R. Sec. 440.80, the Medicaid regulation that defines "private duty nursing services". The United States District Court for the Northern District of New York, Thomas J. McAvoy, Judge, agreed with the secretary and dismissed the complaint of Melissa Detsel, a severely handicapped child who, suing by her mother, had challenged this interpretation as arbitrary and capricious. Although we give administrative agencies considerable deference in interpreting their own regulations, we believe that the secretary has failed to advance any reasonable basis for his decision here. Accordingly, we reverse the judgment of the district court, and remand for entry of judgment in favor of Melissa Detsel.
 
 BACKGROUND
 
 2
 A. Melissa Detsel.
 
 
 3
 Melissa Detsel is an eleven-year-old girl who suffers from multiple physical impairments involving her heart, lungs, digestive system, back, and feet. Melissa was born with an incomplete diaphragm that allowed her abdominal organs to move upward, hindering the development of her lungs. As a result, Melissa's lungs cannot expand and contract sufficiently on their own, and she is unable to breathe without the assistance of a mechanical ventilator. When Melissa was very young, gastrointestinal abnormalities required doctors to perform a "jejunostomy", or gastronomy. Later attempts to correct Melissa's digestive problems were unsuccessful, and she now receives all her food and medication through a "J-tube". Melissa also suffers from several heart defects and orthopedic problems, including congestive heart failure, scoliosis, and club feet. Because of the severity of her disabilities, Melissa requires the services of a trained nurse 24 hours a day.
 
 
 4
 Despite her physical handicaps and the constant presence of nurses and life-sustaining equipment, Melissa has been able to attend public school since kindergarten. Her educational plan includes traditional academic subjects as well as various special programs such as speech and physical therapy. In an affidavit filed with the district court, Robert Brannigan, a school administrator, reported:
 
 
 5
 Melissa has benefitted greatly from her school programs. She has advanced academically and socially; her reading is at the third grade level [as of February 1988]; her speech is greatly improved; and the activity level of her classes has strengthened her physically. * * * Presently, Melissa is having her best year yet. She really enjoys the school experience and the opportunity to interact with and learn from her classmates. * * * Melissa's presence in school also has carryover benefits to her classmates. Her determination and participation in classroom activities provides a very positive example for any under-achievers in her classes; her teachers report that Melissa is "magic" to have in the classroom. * * * Overall, Melissa is quite an extraordinary child. Although her handicaps are extremely severe, she has great aspirations and determination to succeed. She is competitive and independent and she thrives on the learning and other experiences school provides.
 
 
 6
 Although Melissa's school district can fulfill its educational obligations by providing at least one hour of home instruction per day, 18 N.Y.C.R.R. Sec. 200.6(g), Dr. Gregory Liptak, Melissa's treating physician, insists that such limited home tutoring would be "medically devastating" for Melissa. Dr. Liptak notes that the physical involvement and general activity level of Melissa's school program would be impossible to duplicate at home. Maximizing Melissa's physical development and stamina is essential, according to Dr. Liptak, "to better prepare her for the rigors of transplant surgery if her respiratory function deteriorates." Dr. Liptak also describes the psychological and social benefits of exposing handicapped children to normal experiences, and believes that Melissa's growth in these areas depends on her continuation in school. The secretary does not dispute Dr. Liptak's assertions; he opposes only Medicaid's responsibility for providing Melissa's nursing care in settings other than her home or an institution.
 
 
 7
 B. Who Pays?
 
 
 8
 When Melissa enrolled in kindergarten in 1983, it was unclear whether the school district, Medicaid, or neither would be responsible for her nursing care during school hours. Melissa's mother initially sought a declaration that the nursing care was a "related service" under the Education of All Handicapped Children Act (the "EHA"), 20 U.S.C. Sec. 1401(18), and thus within the responsibility of the school district. In that action, however, a panel of this court decided that the constant and intensive nature of the care brought it within the "medical services" exclusion to the EHA, 20 U.S.C. Sec. 1401(17), in contrast to the more routine medical procedures that courts had recently found to be "related services" under the act. Detsel v. Board of Educ., 820 F.2d 587 (2d Cir.1987) (per curiam), aff'g, 637 F.Supp. 1022 (N.D.N.Y.1986), cert. denied, 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987). Cf. Irving Independent School Dist. v. Tatro, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984) (intermittent bladder catheterization, which child could soon perform herself, is "related service" under EHA); Department of Educ. v. Katherine D., 727 F.2d 809 (9th Cir.1983) (occasional repositioning of suction tube in child's throat, which "even a lay person" could do, is "related service" under EHA), cert. denied, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985).
 
 
 9
 The present action addresses the question of whether the cost of Melissa's nurse in school is covered by Medicaid. Medicaid was created in 1965 when congress added Title XIX to the Social Security Act, 42 U.S.C. Sec. 1396 et seq., and was designed as a joint state-federal program to help needy individuals pay for medical care. Once a state elects to participate in the program, it must provide a list of "mandatory services", such as inpatient hospital care, and may also offer one or more "optional services", including private duty nursing. The State of New York includes private duty nursing in its Medicaid plan, and Medicaid currently pays for Melissa's nurses around the clock as long as they care for her at home or in an institution.
 
 
 10
 The secretary's position in this case is based on his interpretation of 42 C.F.R. Sec. 440.80 ("Sec. 440.80"), which reads in full as follows:
 
 
 11
 Sec. 440.80 Private duty nursing services.
 
 
 12
 Private duty nursing services means nursing services for recipients who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility. The services are provided--
 
 
 13
 (a) By a registered nurse or a licensed practical nurse;
 
 
 14
 (b) Under the direction of the recipient's physician; and
 
 
 15
 (c) To a recipient in one or more of the following locations at the option of the State--
 
 
 16
 (1) His or her own home;
 
 
 17
 (2) A hospital; or
 
 
 18
 (3) A skilled nursing facility.
 
 
 19
 A substantially identical version of this definition appeared in the original Medicaid regulations, published in 1966 as the Handbook of Public Assistance Administration, Supplement D. Unfortunately, any documents that might shed light on the rationale for the definition were lost or destroyed in 1977, when the records of the newly-created Health Care Financing Administration ("HCFA") were moved from Washington to Baltimore. Apparently, the only existing document that discusses Sec. 440.80 is a memorandum prepared in 1981 by the HCFA Task Force for Regulatory Reform. The authors of that memorandum could find "no files available which indicated the source or rationale for this definition", but stated that the definition "reflects what is probably a common understanding of when private duty nursing services are generally utilized and who normally provides them."
 
 
 20
 The HCFA report did not deal with the question of whether private duty nursing could be provided in a public school setting. That issue was addressed for the first time in 1984, after a representative of the New York State Department of Social Services wrote a letter to Theodore Shulman, an associate regional administrator for HHS, asking for clarification of the issue. Shulman responded in pertinent part:
 
 
 21
 The State has indicated that it has been receiving an increasing number of claims for the services of private duty nurses in questionable settings, particularly accompanying and furnishing care to children while they are attending school.
 
 
 22
 The regulations at 42 CFR 440.80(c) limit the provision of private duty nursing services "to a recipient in his own home or in a hospital or skilled nursing facility". After thoroughly researching the issue, we conclude that the regulations are quite clear and that Title XIX payment would not be available for private duty nursing services when they are furnished in settings other than those stated in the regulations.
 
 
 23
 In short, Melissa's nursing care would be covered by Medicaid only if the nurse remained in a hospital, in a skilled nursing facility, or within the four corners of Melissa's home. The Shulman letter now represents the secretary's official position on this issue. For convenience, we will refer to it as the "secretary's interpretation" or the "at-home limitation".
 
 
 24
 After exhausting her administrative remedies within the county and state, Melissa, by her mother, brought this lawsuit challenging the at-home limitation. In an order dated September 22, 1988, the district court granted the secretary's motion for summary judgment, holding that the secretary's interpretation of Sec. 440.80 was sufficiently reasonable:
 
 
 25
 The Department's rationale for the restriction is that the benefit of private duty nursing services should be rendered in out of the ordinary cases only and not as a means of paying for services that should be rendered as a matter of course by facilities such as hospitals or skilled nursing facilities. According to the Department, the common understanding of private duty nursing care is one involving extraordinary medical care during periods of critical need and limiting such care to a residential setting, whether that is the recipient's home or an institution, is not unreasonable.
 
 
 26
 The Court agrees with the Department and hereby upholds the Department's interpretation as not unreasonable.
 
 
 27
 This appeal followed.
 
 DISCUSSION
 
 28
 In reviewing the secretary's interpretation of Sec. 440.80, we must first determine whether congress has directly addressed the precise question at issue. If the intent of congress is clear, that ends our inquiry, for the court's duty is to enforce the unambiguously expressed will of congress. Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). If, however, congress has not spoken to the precise question at issue, we must defer to the agency's resolution of the matter if it is based on a permissible construction of the statute and is "sufficiently reasonable". Id. at 844-45, 104 S.Ct. at 2782-83; Weeks v. Quinlan, 838 F.2d 41, 44 (2d Cir.1988).
 
 
 29
 A. Congressional Intent.
 
 
 30
 Detsel and amici argue that the at-home limitation conflicts with "clearly stated" congressional intent as expressed by the broad remedial purposes of the Medicaid Act, and by subsequent legislative activity involving the rights of handicapped persons. They point out that congress created the Medicaid program to assist states in providing "rehabilitation and other services to help [recipients] attain or retain capability for independence or self-care", 42 U.S.C. Sec. 1396, and that congress directed participating states to administer their plans in "the best interests of the recipient". 42 U.S.C. Sec. 1396a(a)(19).
 
 
 31
 Subsequent legislation has expanded the list of services reimbursed by Medicaid, e.g., Pub.L. No. 99-272, Sec. 9508(a)(1) (1986) (codified as amended at 42 U.S.C. Sec. 1396n(g)) (adding "targeted case management" as an optional service under the Medicaid program), and has made it clear that Medicaid is financially responsible for the "related services" identified in a child's individual education plan if those services are covered by the state's Medicaid program. Pub.L. No. 100-360, Sec. 411(k)(13)(A) (1988) (adding subsection (c) to 42 U.S.C. Sec. 1396b). In addition, congress directed the secretary to establish a task force on "technology-dependent children" whose function was to
 
 
 32
 (1) identify barriers that prevent the provision of appropriate care in a home or community setting to meet the special needs of technology-dependent children; and
 
 
 33
 (2) recommend changes in the provision and financing of health care in private and public health care programs (including appropriate joint public-private initiatives) so as to provide home and community-based alternatives to the institutionalization of technology-dependent children.
 
 
 34
 Pub.L. No. 99-272, Sec. 9520 (1986), 42 U.S.C. Sec. 1396a note.
 
 
 35
 While this legislation reveals a trend toward expanding services for the handicapped, and even an awareness of the problems facing children like Melissa, it fails to address the question of whether Medicaid should provide private duty nursing care in school. Our role is not to speculate on what congress might have intended had it considered this question, but rather to determine whether congress "actually ha[d] an intent". Chevron, 467 U.S. at 845, 104 S.Ct. at 2783. Since congress has not yet directly spoken on the scope of private duty nursing, we cannot decide this case on the basis of "unambiguously expressed" congressional intent.
 
 
 36
 B. Reasonableness of the Secretary's Interpretation.
 
 
 37
 Lacking a clear statement of congressional intent, we must defer to the secretary's resolution of the issue as long as it is a reasonable one. Chevron, 467 U.S. at 845, 104 S.Ct. at 2783; Weeks, 838 F.2d at 44. Holding the secretary to a "reasonableness" standard, however, is not equivalent to reviewing his decisions under the "minimum rationality" standard we use in reviewing acts of congress. Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 & n. 9, 103 S.Ct. 2856, 2866 & n. 9, 77 L.Ed.2d 443 (1983). Administrative agencies must articulate a logical basis for their decisions, including "a rational connection between the facts found and the choices made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). As the Supreme Court has emphasized:
 
 
 38
 Agency deference has not come so far that we will uphold regulations whenever it is possible to "conceive a basis" for administrative action. * * * Our recognition of Congress' need to vest administrative agencies with ample power to assist in the difficult task of governing a vast and complex industrial Nation carries with it the correlative responsibility of the agency to explain the rationale and factual basis for its decision, even though we show respect for the agency's judgment in both.
 
 
 39
 Bowen v. American Hospital Assn., 476 U.S. 610, 626-27, 106 S.Ct. 2101, 2112-13, 90 L.Ed.2d 584 (1986) (plurality opinion).
 
 
 40
 The secretary's explanation for the at-home limitation boils down to three basic assertions: (1) the limitation is reasonable because it reflects the "common understanding" of private duty nursing at the time Sec. 440.80 was originally promulgated; (2) the limitation is a rational exercise of the secretary's duty to allocate public resources efficiently; and (3) the limitation should be given special deference because Sec. 440.80 was issued contemporaneously with the Medicaid Act and has remained substantially unchanged since that time. The district court upheld the secretary on the basis of the first rationale without considering the other two. We conclude, however, that none of the explanations advanced by the secretary provides a reasonable ground for upholding the at-home limitation, and we reverse accordingly.
 
 
 41
 1. "Common Understanding" of Private Duty Nursing.
 
 
 42
 According to the secretary, the at-home limitation represents "a rational determination to limit the provision of private duty nursing services to those locations where such services were most commonly being provided at the time the regulation was promulgated." Secretary's Brief at 30. The secretary claims that when the Medicaid regulations were initially formulated in the mid-1960s, private duty nursing was generally recognized as an "out-of-the-ordinary" service that could be provided only in a home or an institution because "the technological advances which permit ventilator-assisted individuals like appellant to leave an institutional or home setting did not exist in 1965". Id. at 33. The at-home limitation is rational, then, simply because it mirrors the common understanding of private duty nursing circa 1965.
 
 
 43
 The secretary bases this argument on a portion of the 1981 HCFA memorandum that discusses the origin and history of Sec. 440.80. The conclusions drawn in the memorandum rest on a questionable evidentiary basis, however, since all documentation relating to Sec. 440.80 was lost in 1977. Lacking any documentary record, the task force posited that Sec. 440.80 represents what was "probably a common understanding" of private duty nursing. It may have been, therefore, merely a description of what was intended to be the full scope of private duty nursing activity at the time. However, the statement is little more than conjecture--an educated guess about the original purpose of the regulation in the absence of any facts, and we can hardly accept an agency's reliance on "evidence" that is itself mere speculation.
 
 
 44
 Even if the secretary was correct in his assumption that Sec. 440.80 was originally intended to limit, rather than merely describe, the common understanding of private duty nursing as it existed in 1965, that limitation would not necessarily remain reasonable today. Congress delegates substantial authority to administrative agencies principally because agencies, given time and experience, acquire a special sensitivity to the evolving needs in the regulated field, and develop "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Nonetheless, agencies must interpret their regulations in light of changing circumstances, particularly in areas characterized by rapid technological development. As the Supreme Court observed about the regulation of the transportation industry,
 
 
 45
 flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.
 
 
 46
 American Trucking Assns. v. Atchison, T. & S.F. Ry., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967); see also City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (reasonableness of ordinance regulating second-trimester abortions undermined by advances in medicine); American Civil Liberties Union v. FCC, 823 F.2d 1554, 1565 (D.C.Cir.1987) (FCC should "carefully monitor the effects of its regulations [of cable television rates] and make adjustments where circumstances so require. * * * [W]e would not expect the Commission to adhere blindly to regulations that are cast in doubt by new developments or better understanding of the relevant facts."), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); Natural Resources Defense Council, Inc. v. Herrington, 768 F.2d 1355, 1408 (D.C.Cir.1985) (DOE efficiency standards for household appliances "would be patently unreasonable" if "based on data half a decade old.").
 
 
 47
 In view of advances in the care of severely handicapped individuals over the past twenty-five years, we do not believe that the medical assumptions of the mid-1960s offer a valid basis for the secretary's interpretation. Two and a half decades ago it may have been widely accepted that a person needing the services of a private duty nurse would be confined to a hospital, a skilled nursing facility, or the four corners of her home, but fortunately these assumptions no longer hold true today. The professional literature cited in the record convincingly demonstrates that private duty nursing is now commonly understood to be "setting independent"; that is, it refers to a level of care rather than to specific locations where the care can be provided. Indeed, the HCFA memorandum itself describes private duty nursing as "care that is beyond that ordinarily available (in terms of time intensity) in the setting an individual is in." Because the secretary's explanation for his narrow interpretation of Sec. 440.80 depends on a static and obsolete view of the relevant facts, we do not accept it as reasonable.
 
 
 48
 2. Administrative Efficiency.
 
 
 49
 The secretary's call to efficiency is also unavailing. The secretary claims, without pointing to any cost figures, that the at-home limitation is an exercise of the department's "line-drawing" role that is "a necessary part of allocating scarce resources among various social welfare programs." Secretary's Brief at 34. As a general proposition, it is quite true that the department deals in finite resources and must set basic eligibility criteria in order to administer its programs efficiently. Economic considerations can provide an important basis for upholding congressional and regulatory action in this area. See, e.g., Lyng v. International Union, UAW, 485 U.S. 360, 108 S.Ct. 1184, 1193, 99 L.Ed.2d 380 (1988) (" 'Fiscal considerations may compel certain difficult choices in order to improve the protection afforded to the entire benefitted class' ") (quoting Harris v. McRae, 448 U.S. 297 at 355, 100 S.Ct. 2671, 2715, 65 L.Ed.2d 784 (1980) (Stevens, J., dissenting)); Bowen v. Gilliard, 483 U.S. 587, 599 & n. 13, 107 S.Ct. 3008, 3016 & n. 13, 97 L.Ed.2d 485 (1987) (" 'General rules are essential if a fund of this magnitude is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases.' ") (quoting Califano v. Jobst, 434 U.S. 47, 53, 98 S.Ct. 95, 99, 54 L.Ed.2d 228 (1977)).
 
 
 50
 Here, however, the secretary fails to show how the at-home limitation furthers any of the department's legitimate fiscal concerns. Medicaid pays for all the supplies and equipment that Melissa needs, whether she remains at home the entire day or attends school, and provides a private duty nurse around the clock in her home. Refusing to permit the nurse to accompany Melissa to school in effect confines Melissa to her home. But this saves no money, because Medicaid would still be responsible for paying for the nurse and for all supplies and equipment while Melissa remained at home. Moreover, since the state will be required to furnish a home tutor if Melissa cannot attend school, the secretary's interpretation would require a greater total expenditure of public resources. Thus the secretary is essentially asking us to accept under his general duty to conserve resources a rule that leads to no savings within his own department and, indeed, to a net increase in overall public spending. This argument surely does not provide us with a reasonable basis for upholding his interpretation.
 
 
 51
 3. Deference.
 
 
 52
 The secretary finally urges us to treat his interpretation with special deference because Sec. 440.80 "was issued virtually contemporaneously with the [Medicaid Act] and has remained substantially unchanged since that time". Secretary's Brief at 26. The short and sufficient answer to this argument is that Sec. 440.80 itself is not being challenged in this lawsuit, only the secretary's narrow interpretation of his regulation. This interpretation, moreover, appears to conflict with the analysis of Sec. 440.80 set forth in the 1981 HCFA memorandum. The memorandum asserts that Sec. 440.80 is "definitive only in terms of stating the professional level of the nurse providing the service", implying, of course, that other aspects of the regulation, including the place restrictions, are not definitive. The memorandum also suggests that intermediate care facilities and nursing homes were omitted from Sec. 440.80 "possibly by accident rather than design", but concludes that private duty nursing would nonetheless be available in those settings. The secretary's present position, by contrast, does not account for these or any other additional locations. Considering the inconsistencies in the department's views in this area, we see no reason to confer any greater degree of deference to the at-home limitation than it would ordinarily deserve.
 
 
 53
 Generally, the weight given to an agency's decisions "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore, 323 U.S. at 140, 65 S.Ct. at 164. Here, the secretary has failed to produce any evidence indicating the rationale for his interpretation, and argues that our traditional deference to administrative action should alone be enough to carry the day. The secretary makes this assertion despite the fact that the at-home limitation is based on obsolete medical assumptions, leads to a net increase in government spending, and is inconsistent with the only other analysis of the rule that the agency appears to have undertaken. Based on these considerations, we conclude that the secretary has failed to provide a sufficiently reasonable explanation for his interpretation.
 
 CONCLUSION
 
 54
 We hold that, under the circumstances of this case, Sec. 440.80 was unreasonably applied to preclude a claimant who resides at home from receiving Medicaid reimbursement for private duty nursing rendered during those few hours of each day when her normal life activities take her outside her home to attend school.
 
 
 55
 The judgment of the district court is reversed and the case is remanded to the district court for entry of judgment in favor of Melissa Detsel. We commend the Auburn Enlarged City School District for voluntarily bearing the cost of Melissa's nursing care in school during the pendency of this action.