Jean Patrick **MICHEL**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

**Docket No. 98–4368.**

United States Court of Appeals, Second Circuit.

Argued Aug. 10, 1999.

Decided Feb. 4, 2000.

Mitchell D. Kessler, New York, N.Y., for Petitioner.

Diogenes P. Kekatos, Assistant United States Attorney for the Southern District of New York, for Mary Jo White, United States Attorney for the Southern District of New York (Steven M. Haber, Assistant United States Attorney for the Southern District of New York, on the brief), for Respondent.

Before: CALABRESI, CABRANES, and SOTOMAYOR, Circuit Judges.

Judge JOSÉ A. CABRANES files a separate opinion with respect to the "single scheme of criminal misconduct" issue, and concurs in the judgment of the Court. Judge CALABRESI dissents from the majority's holding with respect to whether Michel's crimes involve 'moral turpitude' and files a separate opinion to that effect.

CALABRESI, Circuit Judge, delivering the unanimous opinion of the Court with respect to Parts I and II, and the majority opinion with respect to Part III, in which SOTOMAYOR, Circuit Judge, joins:

Jean Patrick Michel, 37, a native of Haiti and a permanent resident of the United States for the past eighteen years, petitions this Court for review of the decision of the Board of Immigration Appeals ("BIA") affirming that he was eligible for removal under 8 U.S.C. § 1227(a)(2)(A)(ii) (Supp. III 1997) as an alien who was "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." Michel seeks review on a number of grounds, claiming lack of representation, absence of a fair removal hearing, and that the BIA erred in holding that his crimes did not arise out of a single scheme of criminal misconduct. We deal with all three of these issues in this opinion and affirm the BIA's decision with respect to all of them.[1] Michel also claims that his crimes do not "involv[e] moral turpitude." The Court will address that issue, and affirm the BIA's conclusion that Michel's crimes involved "moral turpitude," in Part IV of a majority opinion by Judge Sotomayor, in which Judge Cabranes joins.

I.  Background

Michel entered the United States in September 1971 as a lawful permanent resident. In November 1997, however, the Immigration and Naturalization Service ("INS") began proceedings to deport him since he had been convicted twice of criminal possession of stolen property in the fifth degree. On each occasion, Michel pled guilty to possession of stolen bus transfers.

At the removal hearing on November 20, 1997, Michel appeared without counsel. He had hoped that Father Robert Vitaglione (called Father Bob), who had been his representative in a previous immigration case, would represent him.[2] See Certified Administrative Record in A30 675 667 ("R.") at 53. Father Bob, however, could not attend the hearing because one of his church members had been involved in an accident. As a result, before any evidence was taken in the hearing, the Immigration Judge ("IJ") explained to Michel that he had a right to representation. See id. at 57–58. The IJ then asked the petitioner whether he wanted counsel during the hearing or whether he would proceed without representation. Michel responded that he would "speak for [him]self." Id. at 58.

After this exchange, the IJ began to question the petitioner about the allegations in the notice, which stated that Michel was deportable under § 1227(a)(2)(A)(ii), since (1) he had twice been convicted of criminal possession of stolen property in the fifth degree, and (2) those two crimes did not arise out of a single scheme of criminal misconduct. See id. at 151. He also asked Michel about his immigration history. The IJ then adjourned the hearing in order to get Michel's complete immigration file from the INS, including the file from Michel's previ-

---

1. Judge Cabranes concurs in this opinion with respect to Michel's first two claims, but writes separately with respect to the "single scheme of criminal misconduct" issue.

2. Father Bob, although apparently not a lawyer, was authorized to represent aliens at deportation hearings as an 'accredited representative.' See 8 U.S.C. § 1229a(b)(4)(A); 8 C.F.R. § 292.2(d) (1999).

ous deportation proceedings. Because there was a question as to whether Michel's father—with whom Michel has not been in contact for over twenty-three years—had become a citizen when Michel was a minor, thus making Michel a citizen, the IJ asked the INS to find Michel's father's file as well. In addition, before adjourning the hearing to allow the INS time to find the missing information, the IJ again reminded the petitioner that he could contact an attorney or representative to aid him when the hearing reconvened. *See id.* at 75–76.

The hearing resumed on November 26, 1997, but the INS had not located any of the files relating to Michel or his father. The IJ once again adjourned the hearing, requesting that the INS redo its search because he did not want to proceed without complete information.

When the hearing reconvened on December 3, 1997, the INS presented evidence that Michel's father had become a citizen in July 1996. Since Michel was, by then, over the age of eighteen, he could not derive citizenship from his father. *See id.* at 91–92. The IJ then told Michel that his two convictions made him removable under the statute and asked where he would like to be sent. Michel did not offer a preference, other than to remain in the United States, at which point counsel for the INS designated Haiti. The IJ tried to determine if there were any grounds upon which Michel could request asylum, thereafter advising Michel that, although he would provide Michel with an application for asylum and a one-week period to pursue that claim, such a claim did not appear to be viable. The IJ also noted that Michel was not eligible for a waiver of deportation as he had received one in 1993. *See* 8 U.S.C. § 1229b(c)(6) (providing that an alien who has previously received relief in a deportation proceeding is ineligible for a

second cancellation of removal). When the IJ asked Michel if he had anything additional to say, Michel asked to see Father Bob. *See* R. at 100. The IJ denied this request because he did not think it would serve any purpose. *See id.* The IJ then rendered his decision on the record, ordering Michel deported. Michel indicated that he would appeal.

Michel retained counsel for his appeal to the BIA. On October 27, 1998, the BIA, with one member concurring in part and dissenting in part, affirmed the order of deportation. *See* R. at 2–4. The BIA rejected Michel's claim that his right to counsel had been violated, as well as his claim that he did not receive a full and fair removal hearing. *See id.* In addition, the BIA found no merit to Michel's argument that the triviality of his crimes should be considered when deciding whether they involved "moral turpitude," because the "seriousness of a criminal offense.. is [not] determinative of whether a crime involves moral turpitude." *Id.* at 4. Finally, the BIA found that the two crimes did not arise from a single scheme of criminal misconduct. *See id.*

Michel filed a timely petition for review in this Court. *See* 8 U.S.C. § 1252(a)(1). Before us, Michel raises the same issues he raised before the BIA: (1) that he was deprived of his right to representation; (2) that he did not receive the process he was due in his deportation hearing; (3) that his crimes arose out of a single scheme of criminal misconduct; and (4) that his crimes were not ones that involved moral turpitude. The INS argues that the BIA correctly ruled against Michel on all counts.[3] We here consider the first three of Michel's four arguments. The Court will address the merits of Michel's fourth contention in Part IV of a majority opinion by Judge Sotomayor, in which Judge Cabranes joins.

---

**3.** The INS also contends that, even if the BIA did not properly decide the case, we should nonetheless affirm because Michel has been convicted of an "aggravated felony" and is

therefore deportable based on that offense. Because this Court affirms the BIA's determination on other grounds, we need not address the merits of this argument in this opinion.

## II. Michel's Right to Representation and Due Process Claims

■ Under the Due Process Clause and the Immigration and Nationality Act, an alien is entitled to representation of his own choice at his own expense. *See Montilla v. INS*, 926 F.2d 162, 166 (2d Cir. 1991); *see also* 8 U.S.C. § 1362 (providing that in removal proceedings, the person concerned has the privilege of being represented, though at no expense to the Government). To that end, 8 U.S.C. § 1229a(b)(4)(A) directs the Attorney General to adopt regulations to ensure that "the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings." And the regulations adopted by the Attorney General require the IJ to "[a]dvise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice authorized to practice in the proceedings and require the respondent to state then and there whether he or she desires representation." 8 C.F.R. § 240.10(a)(1) (1999).

We have interpreted this rule to allow a waiver of counsel to be found only "where it was possible to make a specific finding that the alien indicated—through what he said to the immigration judge—that he wanted to proceed without counsel." *Montilla*, 926 F.2d at 169. For example, in *Montilla*, we found that the petitioner had not waived his right to counsel, because, although he was asked whether he wanted to be represented at the hearing, his answer was nonresponsive, "demonstrat[ing his] complete ignorance on this subject." *Id.* In *Hidalgo–Disla v. INS*, 52 F.3d 444 (2d Cir.1995), however, we held that an immigration judge did not act improperly in proceeding, despite the absence of an express waiver of representation by the petitioner, after the judge had granted two adjournments and had warned the petitioner that he should be prepared to proceed on the third hearing date with

or without a representative. As we reasoned there, "[i]f an immigration judge could not proceed with a hearing, after two adjournments, without the alien's express waiver, an alien seeking to stave off deportation would be able to win an infinite number of adjournments, and would be better off appearing *without* a lawyer than with one." *Id.* at 447.

■ In this case, Michel argues that he was deprived of his right to counsel since, due to his limited access to the phone, he was unable to contact anyone on the list of lawyers he was given prior to his hearing. This argument is unpersuasive. The IJ offered to postpone Michel's hearing so that he might seek representation, and Michel clearly chose to continue the hearing and to represent himself, even after being warned that he could lose his case:

IJ: Now, do you want some time to try to find a representative, a lawyer, or do you want to speak for yourself and go ahead with your removal/deportation case today?

Michel: I would start myself.

IJ: You want to speak for yourself?

Michel: Yes.

IJ: Do you understand that you could lose your case today? That it's a possibility in other words?

Michel: Yes.

IJ: You do understand that?

Michel: Yes.

IJ: Okay. And you feel that you're able to go ahead and speak for yourself?

Michel: Yes.

R. at 58. Accordingly, there is no merit to this portion of Michel's claim of deprivation of his right to representation.

■ Michel also contends that he made repeated complaints regarding his inability to obtain counsel. These assertions are not borne out by the record. Contrary to Michel's claims, he requested representation only once, and that was *after* the IJ had determined that Michel could be removed and deported:

IJ: Okay. So is there anything additional? I can't think of anything additional, to tell you the truth. Is there anything else you want to explain to me?

Michel: Well, I would like—I was—I was talking to you last week. I was telling you that I was going to wait to talk to Father Bob.

IJ: Well, if I thought it would serve some purpose, I could try to put your case off. It would be still another eight days before Father Bob comes here, and I don't see anything that he could do for you. What can he give you advice about that you haven't already answered yourself?

Michel: Well, maybe—maybe I will sit down with him and then have a little bit more understanding and—

IJ: Well, as far as I'm concerned, sir, no offense, but you had that chance in '93. Father Bob's office represented you then and I don't see that it's going to serve any purpose to put your case off again. You had the opportunity to call them or write them a letter long ago to get advice about your situation, okay?

*Id.* at 100.

This exchange might be troubling if it had been Michel's initial response to the IJ's question as to representation. But it took place, instead, at the very end of the proceeding, after the IJ had made his decision that Michel was eligible for removal, and long after the initial meeting at which Michel had waived his right to representation. We cannot require the IJ to postpone a proceeding every time a party believes that the hearing is going badly, and, as a result, seeks to re-think his or her decision to forego representation. *See Hidalgo–Disla,* 52 F.3d at 447. We therefore reject Michel's claim that he was deprived of his right to representation.

■ To the extent that Michel is also asserting that he was not afforded a full and fair hearing as required by the Due Process Clause, *see Felzcerek v. INS,* 75 F.3d 112, 115 (2d Cir.1996), we find his claim meritless. The IJ in this case went well out of his way to ensure that Michel knew what was happening at all times during the proceeding and never prevented Michel from presenting arguments or evidence in his favor. We note additionally that the IJ adjourned the hearing several times before making his decision to ensure that he had complete and accurate information. We conclude that the IJ acted, procedurally, exactly as we would hope that an IJ would, and that the hearing, far from being "a procedural sham" as Michel alleges, was instead fundamentally fair and was conducted in full compliance with the Due Process Clause of the Fifth Amendment.

III. Michel's Claim That His Crimes Did Not Arise Out of a Single Scheme of Criminal Misconduct Under 8 U.S.C. § 1227(a)(2)(A)(ii)

Under 8 U.S.C. § 1227(a)(2)(A)(ii), an alien who is "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct," may be deported. Michel was convicted under New York Penal Law § 165.40, which provides in relevant part that

[a] person is guilty of criminal possession of stolen property in the fifth degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof.

N.Y. Penal Law § 165.40 (McKinney 1999). The IJ found that Michel's two convictions under this statute constituted "crimes involving moral turpitude" that did not arise "out of a single scheme of criminal misconduct." The BIA—by a divided vote—affirmed this decision, concluding that the crimes were in fact separate and

distinct and that they were convictions involving moral turpitude because "knowledge of the stolen nature of the goods is an element of the offense." R. at 4. In this part, we review the BIA's finding that the crimes did not arise out of a single scheme of criminal misconduct.

The phrase "single scheme of criminal misconduct" in 8 U.S.C. § 1227(a)(2)(A)(ii) is not defined by the statute or in its legislative history. *See Akindemowo v. INS*, 61 F.3d 282, 284–85 (4th Cir.1995). In *Nason v. INS*, 394 F.2d 223 (2d Cir. 1968), this Court adopted an expansive definition of the phrase, permitting a specific, coherent plan of future action to constitute a single scheme of criminal misconduct. *See id.* at 227. *Nason* was decided before *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), in which the Supreme Court held that deference to an agency's construction of a statute is appropriate where that agency is charged with the administration of the law and where "the agency's answer is based on a permissible construction." *Id.* at 843, 104 S.Ct. 2778. The INS, therefore, argues that, rather than follow our definition in *Nason*, we should now defer to the BIA's interpretation of "single scheme of criminal misconduct," limiting this phrase

to "acts, which although separate crimes in and of themselves, were performed in furtherance of a single criminal episode, such as where one crime constitutes a lesser offense of another or where two crimes flow from and are the natural consequence of a single act of criminal misconduct." *In re Adetiba*, Interim Decision, 20 I. & N. Dec. 506, 511, 1992 WL 195812 (1992).

■ We have held, in post-*Chevron* cases, that the BIA is entitled to deference when interpreting other provisions of the Immigration and Nationality Act, as long as those interpretations are reasonable. *See, e.g., Ahmetovic v. INS*, 62 F.3d 48, 51 (2d Cir.1995) (according deference to the BIA's interpretation of "particularly serious crime"). But, to date, we have not answered the specific question of whether we should engage in a *Chevron* analysis with respect to the phrase "single scheme of criminal misconduct" or whether, instead, we should continue to follow our definition in *Nason*. And we need not decide that issue today.[4]

■ Under either definition—the broader one provided in *Nason* or the narrower one urged by the INS—Michel's crimes cannot be said to have arisen out of a single scheme of criminal misconduct. Michel's argument boils down to a claim that he was convicted for the same offense on

4. In his concurrence, Judge Cabranes argues that, by declining to decide the issue today, we "effectively require the INS to continue its general policy of applying this Court's pre-*Chevron* [i.e., the *Nason*] definition of the phrase 'single scheme of criminal misconduct' within this Circuit, while applying the agency's own interpretation" in other circuits. Although the BIA stated in *In re Adetiba*, 20 I. & N. Dec. at 511, that it would continue to apply the *Nason* definition within this Circuit, we note that, in this case, the BIA elected to apply its own definition of "single scheme of criminal misconduct" rather than the pre-*Chevron* definition articulated in *Nason*. *See* R. at 4. We therefore reject the proposition that the BIA will necessarily continue to apply the *Nason* definition of "single scheme of criminal misconduct" until this Court ultimately decides the issue.

Where, as here, no harm results from our failing to answer a question, we believe that

the "doctrine of judicial restraint provides a fully adequate justification for deciding [the] case on the best and narrowest ground available." *Air Courier Conference of Am. v. American Postal Workers Union*, 498 U.S. 517, 531, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991) (Stevens, J. concurring in the judgment). That doctrine is particularly appropriate in the situation before us, for here, resolving the issue might call into question a prior decision of this court, *Nason*. And that is something that we cannot do without the approval of all of the active judges of the court. Moreover, the circumstances of this case would make this request all the more unusual, because we would be asking these judges to take the time to review and to express their approval of our abandonment of *Nason* where that approval, even if given, would be unnecessary to decide this case, where it would, in other words, constitute no more than dicta.

both occasions and therefore the convictions should be considered part of a single scheme. But even under the expansive view embraced in *Nason,* it is not enough that Michel's convictions are for identical conduct. As the *Nason* court explained,

> [i]t is here, especially, that Nason's stress on the similarity between the two crimes misses the mark. It should be noted that the statute does not speak in terms of a "common scheme or plan." The impropriety of such a test is readily apparent for it could be invoked to save an alien who repeated a successful crime already tried and had the good fortune to employ not only the same methods, but also to have chosen the same or a similar victim. Congress meant to give the alien a second chance, not to spare the recidivist.

*Nason,* 394 F.2d at 227.

Because Michel presented no evidence that his crimes—committed two months apart—were the result of a single plan he had devised to steal bus transfers, he cannot succeed on his claim under this Circuit's broad, pre-*Chevron* definition of the phrase. And he certainly cannot succeed under the BIA's narrower one. We therefore affirm the BIA's determination that Michel's two convictions did not arise out of a single scheme of criminal misconduct under 8 U.S.C. § 1227(a)(2)(A)(ii).

SOTOMAYOR, Circuit Judge, announcing the judgment of the Court and delivering the majority opinion of the Court with respect to Parts IV and V, in which CABRANES, Circuit Judge, joins:

## IV. Moral Turpitude Under 8 U.S.C. § 1227(a)(2)(A)(ii)

Michel's final argument on appeal is that he is not removable because his crimes did not "involv[e] moral turpitude" within the meaning of § 237(a)(2)(A)(ii) of the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1227(a)(2)(A)(ii)(Supp. III 1997) stating that an alien "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal

misconduct," shall be removed. Specifically, Michel argues that his criminal offenses—possession of stolen bus transfers in violation of N.Y. Penal Law § 165.40— were so trivial in nature that they cannot be characterized as crimes involving moral turpitude. For the reasons discussed below, we affirm the determination of the Bureau of Immigration Appeals ("BIA") that Michel's two criminal offenses constituted crimes involving moral turpitude and thus warrant removal under § 1227(a)(2)(A)(ii).

### A. The BIA's Determination

In analyzing whether Michel's two criminal offenses involved moral turpitude, the BIA began by referring to the particular section of the New York State Penal Law that Michel twice violated:

> A person is guilty of criminal possession of stolen property in the fifth degree when he knowingly possesses stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof.

N.Y. Penal Law § 165.40 (McKinney 1999) (*quoted in* Certified Administrative Record in A30 675 667 ("R.") at 3). The BIA concluded that, because section 165.40 requires knowledge that the property was stolen, Michel's offenses were necessarily crimes involving moral turpitude:

> This Board has held that a conviction for possession of stolen goods is a conviction for a crime involving moral turpitude if knowledge of the stolen nature of the goods is an element of the offense. *See Matter of Salvail,* 17 I. & N. Dec. 19, 1979 WL 44356 (BIA 1979). The statute under which [Michel] was convicted, New York State Penal [Law] § 165.40, specifically requires knowledge that the property was stolen.

R. at 4. In making its determination, the BIA dismissed Michel's argument that the trivial nature of his crimes should preclude a finding of moral turpitude:

Further, despite [Michel]'s assertions on appeal concerning the triviality of his crime[s], this Board has determined that neither the seriousness of a criminal offense nor the severity of the sentence imposed is determinative of whether a crime involves moral turpitude. *See Matter of Serna*, 20 I. & N. Dec. 579, 1992 WL 301779 (BIA 1992). Accordingly, we agree with the Immigration Judge that [Michel]'s convictions for criminal possession of stolen property are crimes involving moral turpitude.

*Id.*

## B. Standard of Review

■ The INS argues that, in reviewing the BIA's moral turpitude finding, we should defer to the BIA's interpretation of the term "moral turpitude" because that interpretation is reasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that, where a statute is silent or ambiguous as to a specific issue, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"). Unlike, for example, the phrase "single scheme of criminal misconduct" discussed in Part III *ante*, this Court has not provided a relevant pre-*Chevron* definition of the phrase "crimes involving moral turpitude." This case raises the straightforward question of whether the BIA's finding of "moral turpitude" with respect to Michel's section 165.40 violations warrants *Chevron* deference. We conclude that it does.

■ When reviewing an agency determination, federal courts accord substantial deference to the agency's interpretations of the statutes and regulations that it

administers. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (citing *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). By contrast, courts owe no deference to an agency's interpretations of state or federal criminal laws, because the agency is not charged with the administration of such laws. Therefore, notwithstanding some apparent confusion among the circuits on this issue,[1] we join the Fifth Circuit in the view that, where the BIA is interpreting § 237(a)(2)(A)(ii) of the INA, *Chevron* deference is warranted, but where the BIA is interpreting state or federal criminal laws, we must review its decision *de novo*. *See Hamdan v. INS*, 98 F.3d 183, 185 (5th Cir.1996) ("We must uphold the BIA's determination of what conduct constitutes moral turpitude [under the INA] if it is reasonable. However, a determination that the elements of a crime constitute moral turpitude for purposes of deportation pursuant to [the INA] is a question of law, which we review de novo.") (citations omitted). Because Michel challenges the BIA's interpretation of the term "moral turpitude" in § 237(a)(2)(A)(ii) of the INA—not its construction of New York Penal Law § 165.40—we analyze his claim subject to the *Chevron* framework.

## C. The Reasonableness of the BIA's Moral Turpitude Finding

■ Applying the *Chevron* approach, we first ask whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. In answering this question, we note that the term "moral turpitude" is not defined anywhere in the INA and that the INA's legislative history sheds no light on Congress's intent. *See Cabral v. INS*, 15 F.3d 193, 194–95 (1st Cir.1994). Because

1. *See generally Franklin v. INS*, 72 F.3d 571, 577–78 (8th Cir.1995) (Bennett, J, dissenting) (noting an apparent circuit split over the applicable standard of review for BIA findings of moral turpitude). *Compare Rodriguez–Herrera v. INS*, 52 F.3d 238, 240 n. 4 (9th Cir.1995) (stating that whether a state criminal statute involves moral turpitude is a question of law to be reviewed *de novo* ), *with Cabral v. INS*, 15 F.3d 193, 194–97 (1st Cir. 1994) (applying the *Chevron* approach to determine whether a state crime involved "moral turpitude" within the meaning of the INA).

nothing in the statute or its legislative history informs our understanding of the term "moral turpitude," we proceed to *Chevron* step two, which requires us to determine whether the BIA's interpretation of the term "moral turpitude" is reasonable. *See Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. In making this assessment, "[i]t is not necessary that we conclude that the agency's interpretation of the statute is the only permissible interpretation, nor that we believe it to be the best interpretation of the statute." *Skubel v. Fuoroli,* 113 F.3d 330, 336 (2d Cir.1997) (citing *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778). Rather, in order to affirm the BIA's determination, we need only conclude that its interpretation is reasonable and that it "considered the matter in a detailed and reasoned fashion." *Chevron,* 467 U.S. at 865, 104 S.Ct. 2778. We conclude that the BIA has satisfied these criteria.

▮ In this case, the BIA reasoned that, because section 165.40 specifically requires the violator's knowledge that the property was stolen, Michel's offenses were necessarily crimes involving moral turpitude. *See* R. at 4 (citing *In re Salvail,* 17 I. & N. Dec. 19, 1979 WL 44356 (BIA 1979)). Essentially, the BIA made a categorical finding of "moral turpitude" based on the elements of section 165.40, without regard to the particular conduct giving rise to Michel's convictions under that section. We note that, "[a]s a general rule, if a statute encompasses both acts that do and do not involve moral turpitude, the BIA cannot sustain a deportability finding on that statute." *Hamdan,* 98 F.3d at 187. In the instant case, however, upon a *de novo* review of the relevant criminal statute, we conclude that all violations of New York Penal Law § 165.40 are, by their nature, morally turpitudinous because knowledge is a requisite element of section 165.40 and corrupt scienter is the touchstone of moral turpitude. *See, e.g., Hamdan,* 98 F.3d at 186 ("Among the tests to determine if a crime involves mor-

al turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.") (quoting the BIA's definition of "moral turpitude"); *Okoroha v. INS,* 715 F.2d 380, 382 (8th Cir.1983) (affirming the BIA's conclusion that "possession of stolen mail [is] a crime of moral turpitude because knowledge that the article of mail ha[s] been stolen [i]s an essential element of the offense"); *United States ex rel. Meyer v. Day,* 54 F.2d 336, 337 (2d Cir. 1931) (stating that "it is in the intent that moral turpitude inheres"); *In re Flores,* 17 I. & N. Dec. 225, 227, 1980 WL 121870 (BIA 1980) ("An evil or malicious intent is said to be the essence of moral turpitude."); *In re Abreu–Semino,* 12 I. & N. Dec. 775, 777, 1968 WL 14106 (BIA 1968) (stating that "moral turpitude normally inheres in the intent"); *In re P—,* 6 I. & N. Dec. 795, 798, 1955 WL 8755 (BIA 1955) (same).

Applying this principle to its moral turpitude analysis, the BIA in this case articulated its long-standing position that, where knowledge is a necessary element of a crime under a particular criminal statute, moral turpitude inheres in that crime. *See, e.g., In re Ajami,* Interim Dec. BIA 3405, 1999 WL 487022 (BIA July 13, 1999) ("If the statute defines a crime in which moral turpitude necessarily inheres, then the conviction is for a crime involving moral turpitude for immigration purposes, and our analysis ends.") citing *In re Short,* 20 I. & N. Dec. 136, 139, 1989 WL 331878 (BIA 1989)); *In re Bart,* 20 I. & N. Dec. 436, 437–38, 1992 WL 195800 (BIA 1992) (holding that if guilty knowledge is an element of a bad check offense, the crime is one involving moral turpitude citations omitted); *In re Salvail,* 17 I. & N. Dec. at 20 ("Conviction under the [Canadian Criminal Code for knowing possession of stolen goods] is a conviction for a crime involving moral turpitude, as it specifically requires knowledge of the stolen nature of the goods."); *In re McNaughton,* 16 I. & N. Dec. 569, 574, 1978 WL 36469 (BIA 1978) (stating that "whenever a crime has involved intent to defraud, it has been found

to involve moral turpitude"); *In re P——*, 6 I. & N. Dec. at 798 (holding that, where the statute contained the element of criminal intent, the crime involved moral turpitude); *In re R——*, 6 I. & N. Dec. 772, 774, 1955 WL 8749 (BIA 1955) (holding that, because knowledge was an essential element of the crime of receiving stolen goods, the crime involved moral turpitude).

Judge Calabresi's dissent suggests that the BIA's categorical approach to its moral turpitude determination somehow constitutes an abandonment of the general definition of moral turpitude articulated in *Hamdan v. INS*, 98 F.3d 183 (2d Cir.1996). *See post* at 270. We disagree. The *Hamdan* definition explicitly states that "[a]mong the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind." *Id.* at 186. We cannot conclude that the BIA's decision to equate knowledge or intent with a "vicious motive or corrupt mind" constituted an unreasonable interpretation of § 237(a)(2)(A)(ii).

As a policy matter, moreover, the BIA's categorical approach was sound. It is the essence of evenhanded administration of the law to define rules *ex ante* and apply them regardless of the particular circumstances of a given case.[2] The BIA's categorical approach to moral turpitude determinations promotes uniformity and relieves the INS of the oppressive administrative burden of scrutinizing the specific conduct giving rise to criminal offenses. *See Cabral*, 15 F.3d at 197 n. 6 ("[N]either the administrative officials in a deportation proceeding nor the courts on review of administrative action are under the oppressive burden of taking and considering evidence of the circumstances of a particular offense so as to determine whether there were extenuating factors which might relieve the offender of the stigma of moral obliquity.") (internal quotation marks omitted); *cf. Chiaramonte v. INS*, 626 F.2d 1093, 1098 (2nd Cir. 1980) (stating that because of comity concerns and practical considerations, "an alien adjudged guilty by a foreign tribunal of a crime of moral turpitude may not attempt to demonstrate ... [in a deportation proceeding] that his actions were only undertaken in response to exceptional circumstances and that he is morally blameless"). As the BIA stated in a recent case:

> [T]he principle of not looking behind a record of conviction provides this Board with the only workable approach in cases where deportability is premised on the existence of a conviction. If we were to allow evidence that is not part of the record of conviction as proof of whether an alien [committed a crime involving moral turpitude], we essentially would be inviting the parties to present any and all evidence bearing on an alien's conduct leading to the conviction.... Such an endeavor is inconsistent both with the streamlined adjudication that a deportation hearing is intended to provide and with the settled proposition that an Immigration Judge cannot adjudicate guilt or innocence.
>
> If we were to make an exception ..., there would be no clear stopping point where this Board could limit the scope of seemingly dispositive but extrinsic evidence bearing on [an alien]'s deportability. We believe that the harm to the system induced by the consideration of such extrinsic evidence far outweighs the beneficial effect of allowing it to form the evidentiary basis of a finding of deportability.

---

**2.** The Sentencing Guidelines, for example, designate "crimes of violence" according to the elements of the offense and require judges to impose sentences without looking at the underlying facts of the conviction. *See United States v. Telesco*, 962 F.2d 165, 166–67 (2d Cir.1992) (holding that, when a crime is designated as a "crime of violence" by the Sentencing Commission, this Circuit shall employ a categorical approach and the sentencing court may not inquire into the facts underlying that offense).

*In re Pichardo–Sufren,* Interim Dec. BIA 3275, 1996 WL 230227 (BIA 1996) (citations omitted).[3]

In affirming the BIA's moral turpitude determination, furthermore, we find that the BIA considered Michel's arguments in a sufficiently "detailed and reasoned fashion." *Chevron,* 467 U.S. at 865, 104 S.Ct. 2778. Judge Calabresi's dissent takes issue with the BIA's statement that "despite [Michel]'s assertions on appeal concerning the triviality of his crime[s], . . . neither the seriousness of a criminal offense nor the severity of the sentence imposed is *determinative* of whether a crime involves moral turpitude." R. at 4 (citing *In re Serna,* 20 I. & N. Dec. 579, 581–82, 1992 WL 301779 (BIA 1992)) (emphasis added). Noting that "[w]ords matter," Judge Calabresi essentially argues that the BIA confused the distinction between relevancy and determinativeness. *See post* at 268–69. But, just as words matter, so do context and precedent. Indeed, words—particularly in the American judicial system—do not·exist in a vacuum. Read in context and in light of BIA precedent, we find the BIA's analysis to be unmistakably clear: Michel's triviality argument was *irrelevant* to the BIA's moral turpitude determination.

This reading finds support in the fact that (1) the BIA adopted a categorical approach to its moral turpitude inquiry, determining that Michel's crimes inherently involved moral turpitude; and (2) the BIA cited the *Serna* case, which clarified "that neither the seriousness of the offense nor the severity of the sentences imposed is determinative of whether a crime involves moral turpitude. It is *rather* a question of the offender's evil intent or corruption of the mind. . . . Thus, the fact

that a crime may be considered only a minor offense does not preclude a finding that it involves moral turpitude." *In re Serna,* 20 I. & N. Dec. at 581–82 (citations omitted) (emphasis added). It also finds support in recent BIA precedent. In *In re Phong Nguyen Tran,* 1996 WL 170083 (BIA Mar. 28, 1996), for example, the BIA stated:

> Where knowing or intentional conduct is an element of a morally reprehensible offense, we have found moral turpitude to be present. . . . Neither the seriousness of a criminal offense nor the severity of the sentence imposed therefor is determinative of whether a crime involves moral turpitude. *Therefore,* the fact that the [alien] was convicted of a misdemeanor rather than a felony *has no bearing* on whether or not the offense for which he was convicted is a crime involving moral turpitude.

*Id.* (citing *In re Serna,* 20 I. & N. Dec. at 581–82) (emphasis added). In short, a careful reading of the BIA's statement in this case, taken in conjunction with *Serna* and similar BIA decisions, plainly indicates that the BIA used *not determinative* to mean *irrelevant.*

We therefore believe that the BIA considered Michel's triviality argument in a sufficiently detailed and reasoned fashion and found that the trivial nature of Michel's offenses had no bearing upon its analysis. Under *Chevron,* we are not permitted to second-guess the BIA's conclusion in this regard.

For the foregoing reasons, we conclude that the BIA's categorical approach to its moral turpitude determination in this case was reasonable and based on a permissible

**3.** Judge Calabresi's dissent would appear to require the BIA to analyze whether hypothetical cases—having nothing to do with the particular case at hand—would violate section 165.40. Judge Calabresi would ask the BIA to discuss, for example, whether "picking up a penny when one is a ʳpenny short of the amount needed for admission to a homeless shelter violate[s] § 165.40." *Post* at 270 n.1.

While Judge Calabresi is correct that the BIA cannot justify a categorical approach if the relevant statute encompasses both acts that do and do not involve moral turpitude, no rule of law, much less *Chevron,* requires the BIA to engage in such didactic exercises. In this case, it is enough that the BIA noted that knowledge is a requisite element of section 165.40.

construction of § 237(a)(2)(A)(ii) of the INA.

## V. Conclusion

For the reasons set forth in Parts I and II, we unanimously reject Michel's claims that the proceedings before the Immigration Judge violated his rights to representation or due process. For the reasons set forth in Part III of Judge Calabresi's majority opinion, in which Judge Sotomayor joins, the Court also rejects Michel's claim that his two criminal convictions arose out of a single scheme of criminal misconduct. Finally, for the reasons identified in Part IV above, in which Judge Cabranes joins, the Court rejects Michel's claim that his crimes did not involve moral turpitude. Accordingly, we deny Michel's petition for review and affirm the BIA's October 27, 1998 order of removal.

JOSÉ A. CABRANES, Circuit Judge, concurring in the judgment of the Court:

I concur in Judge Calabresi's (partial) majority opinion, except for Part III, and in the entirety of Judge Sotomayor's (partial) majority opinion. Nevertheless, I write separately to express my view that we are required to defer to the Board of Immigration Appeals ("BIA") with respect to its construction of the phrase "single scheme of criminal misconduct" in 8 U.S.C. § 1227(a)(2)(A)(ii).

Before discussing my disagreement, however, I pause to offer some assistance to those who may be perplexed by the decision of my two colleagues to split the writing of a majority opinion, and the decision of one of them to write both a (partial) majority opinion and a (partial) dissent— with the extraordinary result that we publish today four opinions, one opinion more than there are judges on the panel. For the benefit of our hapless readers, I offer here a brief scorecard for the disposition of this case:

(1) Judge Calabresi, Judge Sotomayor, and I agree that Michel was not deprived of the right to representation at his remov-al hearings and that those hearings gave Michel more than the process he was due.

(2) The panel also agrees that Michel's crimes did not constitute a "single scheme of criminal misconduct," although I would further hold that the BIA's definition of "single scheme of criminal misconduct" is entitled to our deference—thereby would avoid any suggestion that this issue remains a live one within this Circuit (more on this anon).

(3) Judge Sotomayor and I agree, contrary to the views of Judge Calabresi, that Michel, who was twice convicted of criminal possession of stolen property in the fifth degree in violation of New York Penal Law § 165.40, was "convicted of two or more crimes involving moral turpitude."

(4) Accordingly, a majority of the members of this panel—namely, Judge Sotomayor and I—agree that the judgment of the BIA should be affirmed in its entirety, and we enter our judgment to that effect.

\*    \*    \*    \*    \*    \*

With that, I turn to the substance of my disagreement with Judge Calabresi and Judge Sotomayor on the question of whether we are required to defer to the BIA's definition of "single scheme of criminal misconduct." As Judge Calabresi notes in his (partial) majority opinion, the phrase "single scheme of criminal misconduct" in § 1227(a)(2)(A)(ii) in not defined by the statute or in its legislative history. *See ante* at 260. The BIA, however, has defined the phrase to mean "acts, which although separate crimes in and of themselves, were performed in furtherance of a single criminal episode, such as where one crime constitutes a lesser offense of another or where two crimes flow from and are the natural consequence of a single act of criminal misconduct." *In re Adetiba*, 20 I. & N. Dec. 506, 511, 1992 WL 195812 (B.I.A.1992). In my view, this definition— adopted by the agency with authority to enforce the statute at issue—is "eminently reasonable, even if not compelled." *Akin-demowo v. INS*, 61 F.3d 282, 286 (4th

Cir.1995). Accordingly, under the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), I believe that we are obligated to accept it as "controlling." *See id.* at 844, 104 S.Ct. 2778 (holding that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency").

Judge Calabresi and Judge Sotomayor do not expressly disagree with this conclusion, but rather choose to defer the Chevron issue to another day on the ground that Michel's crimes did not constitute a "single scheme of criminal misconduct" under either the BIA's definition of the phrase or the definition adopted by this Court—a generation before *Chevron*—in *Nason v. INS*, 394 F.2d 223, 227 (2nd Cir.1968). *See ante* at 260–61. In my view, however, there is no reason to leave this issue, which is squarely presented for our decision, for another day. Thus, I would hold, as has every other Court of Appeals to consider the issue thus far, that the BIA's definition of the phrase is entitled to deference, *see Akindemowo*, 61 F.3d at 284–87; *Thanh Huu Nguyen v. INS*, 991 F.2d 621, 623 (10th Cir.1993); *Iredia v. INS*, 981 F.2d 847, 849 (5th Cir. 1993); *see also Balogun v. INS*, 31 F.3d 8, 9 (1st Cir.1994)(per curiam),[1] and I would

expressly disavow our substitute definition in *Nason*.

Although my colleagues seek to justify their decision to avoid the Chevron issue on the venerable ground of judicial restraint, *see ante* at 260 n. 4, their decision to reaffirm a precedent clearly abrogated by the Supreme Court is, in my view, more akin to the judicial usurpation eschewed by the Supreme Court in *Chevron*. By their decision today, my colleagues effectively require the BIA to continue its general policy of applying this Court's pre–*Chevron* definition of the phrase "single scheme of criminal misconduct" within this Circuit, while applying the agency's own interpretation in those circuits that dutifully have followed *Chevron*. *See Adetiba*, 20 I. & N. Dec. at 510 (discussing the BIA's decision to "follow [its] approach outside of those jurisdictions ... that have followed a more expansive interpretation"); *see also Akindemowo*, 61 F.3d at 286 (discussing the BIA's policy). In so doing, my colleagues disregard "our frequently expressed concern to avoid disparate treatment situated aliens under the immigration laws," *Aguirre v. INS*, 79 F.3d 315, 317 (2nd Cir.1996) (citing cases), and perpetuate a situation in which some aliens face removal and others not, depending solely on where they reside. Just as in *Aguirre*, where we concluded that "the interests of nationwide uniformity [in the administration of immigration laws] outweigh[ed] our adherence to Circuit precedent," *id.*, in this case I

---

1. In *Gonzalez–Sandoval v. INS*, 910 F.2d 614, 616 (9th Cir.1990), a panel of the Ninth Circuit adhered to that Court's pre–*Chevron* definition of the phrase "single scheme of criminal misconduct"—a definition that is similar to the definition adopted by this Court in *Nason*. Nevertheless, there is no indication from the *Gonzalez–Sandoval* opinion that the panel in that case gave any consideration whatsoever to *Chevron*. *See Iredia*, 981 F.2d at 849 ("The only case decided after *Chevron* [that rejects the BIA's definition], *Gonzalez–Sandoval*, does not address the issue." (citation omitted)). Moreover, the BIA has considered the Ninth Circuit's definition, and has rejected in explicitly. In *Adetiba*, the BIA argued that the Ninth Circuit's definition

"would result in extreme absurdities" because it would "insulate from deportability individuals who formulate a plan at one time for criminal behavior involving multiple separate crimes, while making deportable those who commit only two such crimes without a plan." 20 I. & N. Dec. at 511.

For these reasons, the Ninth Circuit's decision in *Gonzalez–Sandoval* is both an outlier and, in my view, incorrect. Therefore, rather than suggesting, as I believe my colleagues do, that we might follow the Ninth Circuit's dubious lead, I would follow the lead of every Court of Appeals to consider the issue in light of *Chevron*, and I would adopt the BIA's definition.

would hold that *Nason* is not longer good law.[2]

For these reasons, I respectfully disagree with my colleagues' choice not to decide the looming *Chevron* issue concerning the phrase "single scheme of criminal misconduct." Instead, I would hold that the BIA's definition is entitled to deference, and I would expressly disavow the substitute definition we adopted in *Nason*. Because Michel's crimes—committed two months apart—plainly were not part of a "single scheme of criminal misconduct" under the BIA's definition, and because I otherwise agree with my colleagues' majority opinion, I concur in the judgment of the Court of affirm the judgment of the BIA in its entirety.

CALABRESI, Circuit Judge, dissenting from Part IV.C of the majority opinion and from the judgment of the Court:

I agree with the majority that because Congress has not, in 8 U.S.C. 1227(a)(2)(A)(ii), directly addressed the question of what crimes involv[e] moral turpitude, we must determine only whether the agency's reading of the law is reasonable. See *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. And, as the majority also makes clear, [i]t is not necessary that we conclude that the agency's interpretation of the statute is the only permissible interpretation, nor that we believe it to be the best interpretation of the statute in order to uphold it. *Skubel v. Fuoroli*, 113 F.3d 330, 336 (2d Cir.1997). But this does not change the fact that statutory interpretation is, in the final analysis, a matter for the courts, *Rosario v. INS*, 962 F.2d 220, 222 (2d Cir.1992), that our review is not merely for minimum rationality, *Detsel v.*

*Sullivan*, 895 F.2d 58, 63 (2d Cir.1990), and that [a]dministrative agencies must articulate a logical basis for their decisions, including a rational connection between the facts found and the choices made. *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). .

This means that under *Chevron*, we may defer to an agency interpretation only if the agency has adequately explained its rationale and the factual basis for its decision. See *Detsel*, 895 F.2d at 63. Conversely, we should not accept an agencys decision simply because it is possible to conceive of a basis for the agencys action. Our inquiry should be more searching, see *id.*, and, at the least, in order to find that the agencys construction is reasonable, we should be able to point to evidence that it considered the matter in a detailed and reasoned fashion. *Chevron*, 467 U.S. at 865, 104 S.Ct. 2778.

In this case, the BIA said two things and only two things when it was asked whether Michels crimes involved moral turpitude: (1) that it has always held possession of stolen property (with the knowledge that it is stolen) to be a crime involving moral turpitude and (2) that neither the seriousness of the crime nor the severity of the sentence is determinative of whether a crime involves moral turpitude. *See* R. at 4. These were the sole responses that the agency gave to Michel's request that it *consider* the fact that his crimes were seemingly minor ones. In my view, they are not enough to qualify the BIA's holding as adequately explained for the purposes of *Chevron*.

2.   Where, as in this case, on e of our previous decisions has plainly been abrogated by the Supreme Court, I do not believe we are required to seek "approval of all of the active judges of the court" to state as much. *Ante* at 260 n.4. Nevertheless, even assuming tht a "mini en banc" would be required to overrule *Nason*—as Judge Calabresi and Judge Sotomayor suggest, *see id.*—my colleagues greatly exaggerate the significance of the procedure

in this instance. For one thing, deferring the *Chevron* question to another day, as the majority has chosen to do, will not obviate the presumed need for a mini en banc—it will merely postpone the inevitable. In addition, I am confident that the other judges of this court would, without taking much time at all to review the matter, reach the conclusion that *Nason* does not survive *Chevron*.

The BIA's statement that the seriousness of the crime is *not determinative* does not tell us why the agency did not *consider* Michel's claim that his convictions, given their allegedly trivial nature, were not for crimes involving moral turpitude. To say that something is not determinative is obviously not the same as saying that is irrelevant and hence is not to be weighed at all. Thus, while I can understand and can agree with what the BIA *said*—that the gravity of the offense should not decide the question—I cannot, without more explanation, accept the statement as justifying what it *did*, which was to treat the alleged triviality of the conduct as irrelevant to its decision.

On this issue, the majority purports to read the BIA's language "in context" and holds that it is clear that what the BIA meant to say was that "Michel's triviality argument was irrelevant." In other words, the majority permits the BIA to equate *irrelevant* with *not determinative.* But saying the *irrelevant* is the same as *not determinative* is like saying green is puce; it isn't, and no amount of talk will make it so. Words matter. And I cannot subscribe to an approach that, in order to affirm a result the court deems desirable, allows an agency to employ language in ways that are at war with the words it uses. I believe instead it is the job of the courts to make agencies describe exactly what they are doing. I believe this because only in this way can agencies be held responsible to Congress and ultimately to the people.

Suppose a group of constituents seeks to make sure that triviality of crimes is a matter that is considered in deportation cases. The group goes to talk to a Senator. The Senator reads that the BIA has consistently said that the seriousness or triviality of a crime is *not determinative* of the issue of moral turpitude. That Senator may well conclude that the BIA position is perfectly sensible. Indeed, we all agree that it would be. But the Senator might react very differently, as might the public, if the BIA had said *clearly* and *expressly* what the majority says it means to say in this case, that the seriousness or triviality of a crime is *irrelevant* to moral turpitude.

Nor does the BIA's other explanation for its decision suffice. Here, too, more is needed under *Chevron.* I agree completely with the majority's view that a categorical approach under § 1227(a)(2)(A)(ii)(one that would not require an analysis of moral turpitude as to each criminal law violated but instead allowed such decisions to be made broadly with respect to whole categories of crimes) could constitute a possible and not unreasonable interpretation of the statute. But we can only defer to such a reading of § 1227(a)(2)(A)(ii) if an adequate justification for this approach is provided by the BIA. To describe a practice, moreover, is not to justify it or to explain it. As a result, to say, as the BIA did, that it has consistently held that knowing possession of stolen property constitutes moral turpitude, even if true, in not enough. And the fact that the majority thinks that a categorical approach to moral turpitude is a good one, and spends considerable time explaining why, is of no help either. It is the BIA that must explain why *it* chooses to adopt an approach, not us. Indeed, I dissent from the majority's holding precisely because, regardless of how much we as judges may like the categorical approach, the BIA has not itself justified what it appears to be doing in this case.

In support of its position that the BIA has adequately told us why it has decided to employ a broad categorical approach, the majority points to *In re Pichardo–Sufren,* 1996 WL 230227 (BIA 1996). But that case stands for the unremarkable proposition that the BIA will not look "behind the record of conviction" when determining whether a particular person's crime involve moral turpitude. Moreover, the BIA in *Pichardo–Sufren* well explained the reasons for this position. In doing so, it echoed what this Court and others, long before *Chevron,* had said in also holding

hat the singular circumstances of an individual petitioner's crimes should not be considered, and only the minimum criminal conduct necessary to sustain a conviction under a given statute is relevant to a determination of whether the violation at issue involved moral turpitude.[1] *See United States ex rel. Guarino v. Uhl*, 107 F.2d 399, 400 (2nd Cir.1939); *see also Hamdan*, 98 F.3d at 189.

The issue here, however, it not whether the BIA should consider Michel's particular circumstances (why and how he violated this particular statute) but rather whether the BIA has justified an approach that, instead of analyzing moral turpitude as to each statute violated, allows such decisions to be made broadly with respect to whole groups of crimes, i.e., all crimes involving the possession of stolen property. As noted above, the BIA, in cases like *In re Pichardo–Sufren*, has explained why it is unwise to look to the individual circumstances to each wrongdoing. I, therefore, agree that the particular events underlying Michel's crime should not be considered here. but hat in no way indicates that the BIA has adequately explained why deciding moral turpitude by broad categories of crimes is the proper approach.

Aside from not justifying its categorical approach or explaining how *not determinative* can equal *irrelevant*, the BIA's decision, in fact, violates its own long-standing definition of "moral turpitude." That definition provides that:

> [m]oral turpitude refers generally to conduct that shocks the conscience as being inherently base, vile, or depraved, and contrary to the accepted morality and the duties owed between persons or to society in general. Moral turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude. Among the tests to determine if a crimes involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.

*Hamdan*, 98 F.3d at 186 (citations omitted)(quoting from the BIA decision in *Hamdan*). Given the fact that this definition of "moral turpitude" appears to require some analysis of whether a particular crime is "inherently base, vile, or depraved, or contrary to the accepted morality and the duties owed between persons or to society in general," it is hard to understand how the gravity of the crime can play *no* part in the inquiry. And it is even more difficult to see how this definition can be applied in an approach that looks solely to broad categories of crimes.

Let me be absolutely clear. I am not saying that the alleged triviality in this

---

1. In this respect, I note that although Michel's alleged behavior—possession of stolen bus transfers—may seem to constitute the least necessary to violate § 165.40, I would also ask the BIA, as part of a full explanation for its decision in this case, to consider whether in fact yet more minor wrongdoings would also contravene the statute. For example, would picking up a penny when one is a penny short of the amount needed for admission to a homeless shelter violate § 165.40, of the individual picking up the coin knows that the person who dropped it is aware of the loss and is looking for the penny? In my view, this is essential if the BIA employs a categorical approach because then the BIA must explain why this specific statute fits into the applicable category, given the minimum conduct needed to violate it. *See Hamdan*, 98 F.3d at 189 ("The general rule is that, absent specific evidence to the contrary in the record of conviction, the statute must be read at the minimum criminal conduct necessary to sustain a conviction under the statute." (citing *Guarino*, 107 F.2d at 400)). Requiring the BIA to do this is not indulging in abstract hypotheticals as the majority suggests. It is simply asking the BIA to consider what the minimum conduct needed to violate a statute is, and to decide whether *that* conduct is morally turpitudinous That is precisely what *Hamdan* and *Guarino* mandate and correctly so, for only once that is done can the BIA say categorically that *all* violations of the statute entail moral turpitude.

case forecloses moral turpitude. The BIA can surely seek to show that the stealing of transfers (or whatever behavior it determines constitutes the minimum conduct for violating the statute), even if seemingly a trivial act, in an "inherently base, vile, or depraved" crime. Nor am I contending that the BIA cannot abandon its *Hamdan* definition and (after explaining why the change is appropriate) adopt a definition of moral turpitude that relies solely on broad categories of crimes, such as possession of stolen property if one knows that it is stolen. I am only saying that in the case before us, the BIA has done neither of these.[2]

The majority believes that the categorical approach employed by the BIA here—any crime that involves "corrupt scienter" involves moral turpitude—has been adequately justified by the agency. It does so, at least in part, because the majority deems such a result to be "sound." I, instead, am not satisfied that the BIA has considered, let alone explained, its decision in the detailed fashion that is required by *Chevron*, a fashion that is an essential element of our obligation to defer to what the *agency* decides is "sound." Accordingly, I would remand the case to the BIA for a fuller explanation and therefore respectfully dissent from the majority's denial of Michel's petition.[3]

2. There are in fact at least three decisions involving specificity and moral turpitude that could be made. The first is whether the decision maker should consider the individual circumstances of the perpetrator or simply the crime committed. In *Pichardo–Sufren*, the BIA opted for the latter and justified that choice. The second involves whether the decision maker should consider the range of crimes the violated statute encompasses or focus instead on the actual statutory violation. On this point, courts have urged decision makers to look to the minimum conduct that is necessary to support a conviction under a statute when deciding whether the statute entails turpitude. *See, e.g., Guarino*, 107 F.2d at 400; *cf. Hamdan*, 98 F.3d at 187–89 (reversing the BIA's order of deportation because the petitioner had been convicted under a statute that included conduct that did not constitute moral turpitude and it was unclear whether the petitioner had been convicted under a section of the statute that involved moral turpitude or one that did not). Finally, the decision maker could employ a broader categorical approach. It could say, as the BIA did in this case, that any statute that fits into a wide range of laws—i.e., all those that prohibit possession of stolen property with the knowledge that it is stolen—connotes moral turpitude. And it could justify this position on grounds of administrative convenience.

In fact, any of these three possibilities *could* be justified if it was consistent with the BIA's other pronouncements regarding moral turpitude and was adequately explained. But the choice made in this case is both hard to accept in the light of the *Hamdan* definition and made without any justification.

3. Because I dissent from the disposition of case, I cannot ignore the INS's argument that the BIA can be affirmed on other grounds, i.e., the other crime allegedly committed by Michel. The short answer is that, as the BIA pointed out in its opinion, the IJ made no findings with respect to any such crime. *See* R. at 3. Since the alleged crime is neither part of the deportation notice sent to Michel nor of the record before us, we cannot treat it as relevant to the issue before us.