Dr. Natawadee **STEINHOUSE**,
Plaintiff,

v.

John **ASHCROFT**, Defendant.

No. 3:02 CV 309(SRU).

United States District Court,
D. Connecticut.

Feb. 26, 2003.

---

Michael G. Moore, Law Offices of Maria De Castro Foden, Hartford, CT, Steven A. Morley, Philadelphia, PA, for petitioner.

James K. Filan, Jr., U.S. Attorney's Office, Bridgeport, CT, for respondent.

## MEMORANDUM OF DECISION

UNDERHILL, District Judge.

Plaintiff Natawadee Steinhouse, a lawful permanent resident of the United States who pled guilty to an aggravated felony, petitioned the court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 to review the lawfulness of her final order of removal. Steinhouse argues that her ineligibility as a lawful permanent resident for a waiver of conviction under section 212(h) of the Immigration and Nationality Act denies her equal protection of the laws. Steinhouse also argues that the Board of Immigration Appeals erred as a matter of law in finding that she had committed a particularly serious crime, thereby barring her from seeking a withholding of removal under section 241(b)(3) of the Immigration and Nationality Act. For the reasons discussed below, the court concludes that the Board of Immigration Appeals erred as a matter of law in holding that Steinhouse committed a particularly serious crime. Steinhouse's writ of habeas corpus (Dkt. No. 1) is therefore GRANTED. The case is remanded to the Board of Immigration Appeals for reconsideration of whether, under the correct standard of law, Steinhouse's crime was particularly serious.

## BACKGROUND

Dr. Natawadee Steinhouse came to the United States as an exchange visitor from Thailand in 1970. She became a lawful permanent resident of the United States in 1971, when she married a United States citizen. At the time of her marriage, Steinhouse also converted from Buddhism to Judaism. She and her husband have four adult children.

In 1998, Steinhouse pled guilty to count one of an indictment charging her with racketeering, a violation of 18 U.S.C. § 1962, and count eleven charging her with selling drug samples, a violation of 21 U.S.C. §§ 353(c)(1) and 333(b)(1)(B). The sentencing guidelines called for a sentence of between one hundred thirty-five and one hundred sixty-eight months. Because he found that Steinhouse suffered from a significantly reduced mental capacity, Judge John Fullam departed downward under

section 5K2.13, sentencing her to three years' imprisonment.[1]

The Immigration and Naturalization Service ("INS") initiated removal proceedings on September 10, 1999. Because Steinhouse committed an aggravated felony as defined by section 101(a)(43)(J) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(43)(J), she was deportable under section 237(a)(2)(A)(iii) of the INA, 8 U.S.C. § 1227(a)(2)(A)(iii).

On July 11, 2000, Immigration Judge Eliza Klein ("IJ") ordered that Steinhouse be removed from the United States to Thailand. Steinhouse applied for a withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), on the grounds that she would face religious persecution in Thailand because she is Jewish. Section 241(b)(3) provides:

> [T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

However, section 241(b)(3) does not apply "if the Attorney General decides that ... the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B). The IJ concluded that the nature of Steinhouse's offense was particularly serious and that she constituted a danger to her community, thus precluding her from seeking withholding of removal.[2]

Steinhouse appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). Among other arguments raised, Steinhouse argued that the IJ failed to give adequate consideration to the respondent's mental impairment in making the determination of whether the offense is particularly serious. The BIA agreed with the IJ that the crime was particularly serious, and therefore concluded that Steinhouse was removable because she had committed an aggravated felony.

In concluding that Steinhouse's crime was particularly serious, the BIA failed to consider the complete set of established factors for making that determination. The opinion states:

> Whether a crime is particularly serious, depends upon an examination of the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction. *See Matter of L–S–*, Interim Decision 3386 (BIA 1999); *Matter of S–S–*, Interim Decision 3374 (BIA 1999); *Matter of Frentescu*, 18 I & N Dec. 244, 1982 WL 190682 (BIA 1982).

This statement excludes the fourth and most important *Frentescu* factor: "whether the type and circumstances of the crime indicate that the alien will be a danger to

---

1. Dr. Steinhouse has been diagnosed with Bipolar II disorder, a condition that doctors opined, and the sentencing judge found, contributed to her criminal behavior.

2. Immigration Judge Klein stated in the oral decision that:

 "Now it may be that this Respondent as required has committed a violent offense and it may not be that the sentencing court found that an extended period of incarceration was needed in order to protect the public, I find, based on the evidence as it

was presented to the sentencing judge that this crime is a particularly serious crime and constitutes a danger to the community of the United States.... I do believe that the facts are incontrovertible that this is a particularly serious offense that she was convicted of and she constitutes a danger to the community of the United States, and she is accordingly not eligible for withholding of removal pursuant to Section 241(b)(3)." Gov. Mem. Ex. 2, *Oral Decision of the Immigration Judge* at 6–7.

the community." *Matter of Frentescu,* 1982 BIA LEXIS 14, 18 I & N Dec. 244, 247, 1982 WL 190682 (BIA 1982).

## ANALYSIS

1. *This court has jurisdiction to hear the legal claims raised by Steinhouse's habeas petition, but has limited authority to hear factual claims.*

The INA states that courts lack jurisdiction to review the discretionary decisions of the Attorney General. Section 242(a)(2)(B) of the INA, 8 U.S.C. § 1252(a)(2)(B), provides that "[n]otwithstanding any other provision of law, no court shall have jurisdiction to review ... any other decision or action of the Attorney General the authority for which is specified under this subchapter to be in the discretion of the Attorney General, other than the granting of relief under section 1158(a) of this title."

■■■ The court does have jurisdiction under the general habeas statute, 28 U.S.C. § 2241, to review the BIA's decision. *See INS v. St. Cyr,* 533 U.S. 289, 314, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *Kuhali v. Reno,* 266 F.3d 93, 99 (2d Cir.2001). Section 2241 provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." The jurisdictional bar in section 242 of the INA "does not explicitly mention a repeal of habeas jurisdiction and therefore does not deprive a federal court of its habeas jurisdiction under 28 U.S.C. § 2241 with respect to criminal aliens challenging final orders of removal." *Kuhali,* 266 F.3d at 99 (citations omitted); *see also St. Cyr,* 533 U.S. at 314, 121 S.Ct. 2271 ("we conclude that habeas jurisdiction under § 2241 was not repealed by AEDPA and IIRIRA"); *Calcano–Martinez v. INS,* 232 F.3d 328, 343 (2d Cir.2000) ("[H]ad Congress intend-

ed to strip federal courts of habeas jurisdiction under 28 U.S.C. § 2241 over criminal aliens' statutory and constitutional challenges, it would have done so by making its intent explicit. Because the permanent rules do not mention a repeal of 28 U.S.C. § 2241 or habeas jurisdiction generally, we hold that they do not deprive a federal court of its habeas jurisdiction under § 2241 to review the purely legal claims of criminal aliens against final orders of removal.") (citations omitted), *aff'd,* 533 U.S. 348, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001); *id.* at 338.

■■■ However, the court's jurisdiction under section 2241 is limited. The court may review all purely legal claims. *Soto v. Ashcroft,* No. 00 Civ. 5986, 2001 WL 1029130, *4 n. 3, 2001 U.S. Dist. LEXIS 13787, at *12 n. 3 (S.D.N.Y. Sept. 10, 2001) ("[N]either AEDPA nor IIRIRA repealed general federal habeas jurisdiction under 28 U.S.C. § 2241 to entertain challenges to INS removal decisions raising pure questions of law."). The highly deferential substantial evidence standard applies to all factual claims, and as a result, this court's court's authority to review factual determinations is "exceedingly narrow." *See Deng v. McElroy,* 10 Fed. Appx. 10, 12 (2d Cir.2001) (giving "particular deference to the credibility determinations of the IJ") (internal quotation marks omitted); *Mu–Xing Wang v. Ashcroft,* No. 3:01CV1353, 2001 U.S. Dist. LEXIS 21245, at *15 (D.Conn. Dec. 7, 2001) ("As noted above, this Court does not sit as an appellate court to review the decision of the BIA. Our jurisdiction in ruling on petitioner's § 2241 habeas petition is far more circumscribed. Although the exact scope of our review of factual determinations is not at all well defined, it is clear that § 2241 does not vest this Court with the authority to review credibility determinations made

by the IJ or to reweigh the evidence. A number of cases have applied a 'substantial evidence' standard and have emphasized that the scope of our review under § 2241 is 'exceedingly narrow.' ") (citations omitted). Under the substantial evidence standard, the court may only determine whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996) (citations omitted).

In the present case, the court has jurisdiction under the federal habeas statute to review the standard applied by the BIA for determining whether Steinhouse's crime is particularly serious. The court also has jurisdiction to hear Steinhouse's claim that the statutory scheme violates the Equal Protection Clause. However, the court lacks authority to determine whether the BIA failed to give Steinhouse's mental impairment appropriate weight.

**2.** *No violation of the Equal Protection Clause occurred.*

■ Under *Jankowski–Burczyk v. INS,* 291 F.3d 172 (2d Cir.2002), the ineligibility of lawful permanent residents ("LPRs") for discretionary waivers based on family hardship under § 212(h) does not constitute a denial of equal protection. The Second Circuit concluded that LPRs and non-LPRs are not similarly situated and, therefore, differing treatment of these two groups could not violate the equal protection component of the Due Process Clause. *Id.* at 178. The Court of Appeals has held that, even if LPRs and non-LPRs were similarly situated, the differences in treatment are rationally related to a legitimate government purpose. *Id.* Accordingly, the court concludes that Steinhouse's equal

protection claim is insufficient as a matter of law, and therefore dismisses that claim.

**3.** *The Board of Immigration Appeals erred as a matter of law by applying the incorrect standard to determine whether Steinhouse's crime was particularly serious.*

**a.** *The "particularly serious crime" requirement.*

■ Steinhouse's memorandum alleges that the BIA erred as a matter of law by failing to adhere to the "clear guidelines" established by prior BIA decisions for determining whether a crime was particularly serious. Pl. Mem. at 16. The court agrees. The BIA's deviation from the established factors for determining whether a crime was particularly serious renders its decision arbitrary and caprious, both because it fails to apply a consistent standard and because it departs from the plain meaning and intent of the statute.

· Section 241(b)(3)(A) of the INA, 8 U.S.C. § 1231(b)(3)(A), provides that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." However, this prohibition on removal does not apply where "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii).

A crime is "particularly serious" when it is "an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years," or when the Attorney General determines that, "notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious

crime." 8 U.S.C. § 1231(b)(3)(B).[3] Other than the phrase "is a danger to the community," the statute itself does not give the Attorney General any guidance in making this determination, thus leaving the decision to the Attorney General's discretion.

In *Matter of Frentescu*, 1982 BIA LEXIS 14, 18 I & N Dec. 244, 1982 WL 190682 (B.I.A.1982), the BIA explained when IJs and the BIA should exercise this discretion and find that a crime with an aggregate term of imprisonment of less than five years is particularly serious. Some crimes are per se "particularly serious" or per se not "particularly serious." *See id.* at 247, 1982 WL 190682 ("[T]here are crimes which, on their face, are 'particularly serious crimes' or clearly are not 'particularly serious crimes.'").

▆ When a crime is neither particularly serious or not particularly serious per se, IJs and the BIA should consider a set of four factors on a case-by-case basis to determine the seriousness of the crime:

> In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community.

*Id.; see also Yousefi v. INS*, 260 F.3d 318, 328 (4th Cir.2001) ("This standard is applied through a case-by-case analysis of the circumstances, even when the name of the crime sounds quite serious."); *Frentescu*, 1982 BIA LEXIS 14, 18 I & N Dec. at 247, 1982 WL 190682 ("[T]he record in most proceedings will have to be analyzed on a case-by-case basis."). Both the BIA and the courts have consistently recognized the *Frentescu* factors as the standard for determining whether a crime is particularly serious. *See Yousefi*, 260 F.3d at 328 ("Frentescu, decided in 1982, continues to supply the standard for identifying a particularly serious crime."); *In re S–S–*, 1999 BIA Lexis 1, at *11, 22 I & N Dec. 458, 1999 WL 38822 (B.I.A.1999) (quoting all four *Frentescu* factors).

While *Frentescu* clearly anticipated that most crimes were not per se serious, and therefore the *Frentescu* factors would apply, *see Frentescu*, 1982 BIA LEXIS 14, 18 I & N Dec. at 247, 1982 WL 190682, the language used by the Second Circuit suggests that perhaps a broader variety of crimes are either particularly serious or not particularly serious per se, *see Ahmetovic v. INS*, 62 F.3d 48, 52 (2nd Cir.1995) ("Only where there is room for disagreement as to whether the crime in question was 'particularly serious' should the BIA resort to examining [the *Frentescu* factors].").

Some *Frentescu* factors are more important than others. In *Yousefi v. INS*, 260 F.3d 318 (4th Cir.2001), the Fourth Circuit stated that "[t]he last two factors are the most important because unless they are considered, the record has not been 'analyzed on a case-by-case basis,' as required by Frentescu." 260 F.3d at 329; *see also id.* at 330 ("The more significant problem is that the immigration judge and the Board failed to consider the most important Frentescu factors, specifically, the circumstances and underlying facts of the conviction and whether the circumstances

---

3. Under the former section 243(h), 8 U.S.C. § 1252(h) (1990), all aggravated felonies constituted particularly serious crimes. In 1996, Congress amended section 243(h) to provide the Attorney General discretionary authority to determine whether an offense is particularly serious, limited to those offense for which the penalty is less than five years imprisonment. Congress later recodified section 243(h) as section 241(b)(3).

of the crime indicate that Yousefi would be a danger to the community.").

b. *The "danger to the community" requirement.*

Although the Second Circuit has addressed many related questions regarding the Attorney General's discretion in construing this statute, it has not yet resolved whether the Attorney General may wholly decline to consider whether the alien is a danger to the community before withholding asylum. For the reasons discussed below, the court concludes that when a crime is neither per se particularly serious or per se not particularly serious, the IJ and BIA must consider whether the circumstances of the crime indicate that the alien will be a danger to the community.

1) *Most courts have held that when a crime is "particularly serious," the alien is necessarily a danger to the community.*

The majority of courts have held that if the offense is a "particularly serious crime," the alien is a danger to the community. *See Ahmetovic,* 62 F.3d at 53 ("[T]he BIA's interpretation conflating the two requirements has been accepted by every circuit that has considered the issue."); *Yousefi,* 260 F.3d at 327–28 ("If the alien has been convicted of an offense that qualifies as a 'particularly serious crime,' then the alien is necessarily a danger to the community and is ineligible for withholding of deportation."); *Kofa v. INS,* 60 F.3d 1084, 1088 (4th Cir.1995) (en banc) ("[O]nce the particularly serious crime determination is made, the alien is ineligible for withholding without a separate finding on dangerousness."); *Crespo–Gomez v. Richard,* 780 F.2d 932, 934–35 (11th Cir.

1986) (decided under former 8 U.S.C. § 1253) ("The statute . . . does not connect its two clauses with a conjunction; rather the statute sets forth a cause and effect relationship: the fact that the alien has committed a particularly serious crime makes the alien dangerous within the meaning of the statute. Accordingly, the only finding required by section 1253(h)(2)(B) is that the alien has been convicted of a 'particularly serious crime.' " (citation omitted). No independent inquiry into danger to the community is necessary.[4]

2) *The courts appear split on whether the IJ and BIA must consider dangerousness in determining whether a crime is particularly serious, or whether they may entirely ignore the dangerousness consideration.*

Recently, the BIA has ceased considering the fourth *Frentescu* factor. *See, e.g., In re S–S–,* 1999 BIA Lexis 1, at *24, 22 I & N Dec. 458, 1999 WL 38822 (considering "the nature of the crime, the length of the sentence, and the circumstances under which the robbery was committed," but not whether the type of crime and circumstances of the crime indicate that the alien will be a danger to the community). These cases often cite *Frentescu* and quote all four factors, but then fail to apply the most important one, *see id.* at *11, thus raising the question of whether IJs and the BIA may entirely ignore dangerousness in determining whether an alien is eligible for asylum.

The Fourth Circuit answered this question in *Yousefi,* concluding that the failure to consider all *Frentescu* requirements was unacceptable:

---

**4.** These cases do suggest, however, that danger to the community is the most important *Frentescu* factor. Danger to the community is implicitly included in the determination of the crimes classified as per se serious.

In this case we are compelled to find the decisions of the Immigration Judge and Board to be arbitrary and capricious. The deportation proceedings against Yousefi have been plagued by a complete failure of the decision makers to consider key Frentescu factors.... The last two factors are the most important because unless they are considered, the record has not been 'analyzed on a case-by-case basis,' as required by Frentescu.

*Id.* at 329. Although the BIA in *Yousefi* also considered additional, "irrelevant factors," the Fourth Circuit stated that "[t]he more significant problem is that the immigration judge and the Board failed to consider the most important Frentescu factors." *Id.* at 330.

In contrast, a possible implication of the Second Circuit's decision in *Ahmetovic v. INS,* 62 F.3d 48 (2d Cir.1995), is that IJs and the BIA may wholly ignore dangerousness. In *Ahmetovic,* a case involving a crime that was "particularly serious" per se, the Second Circuit held that the BIA need not consider whether the alien constitutes a danger to the community. The court admitted that:

> Arguably, the language "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community" suggests that a separate finding as to the alien's "dangerousness" is required. Otherwise, the clause concerning "danger to the community" might seem superfluous.

*Id.* at 52 (citations omitted). Nonetheless, despite being "troubled by the BIA's failure to give separate consideration to whether Mati is a 'danger to the community,'" *id.,* the Second Circuit deferred to the BIA's judgment because it found the BIA's statutory interpretation to be permissible. *Id.* at 53 (citations omitted).

c. *Ahmetovic is distinguishable because there was a "particularly serious" per se.*

█ The court concludes that the Second Circuit's decision in *Ahmetovic* is distinguishable from the present case because it addressed a crime that was particularly serious per se. For the following reasons, the court agrees with the Fourth Circuit's decision in *Yousefi* and concludes that the BIA's decision was arbitrary and capricious because it failed to consider whether the circumstances of the crime indicated that the alien would be a danger to his community.

First, the plain meaning of the statute requires some consideration of dangerousness. The statute states that section 241(b)(3) does not apply "if the Attorney General decides that ... the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." In interpreting statutes, courts should avoid constructions that render statutory terms superfluous.

*Ahmetovic* is distinguishable on these grounds because the BIA must have explicitly or implicitly taken danger to the community into consideration in determining that an alien who commits first degree manslaughter has committed a crime that is "particularly serious" per se. Therefore, when a crime that is "particularly serious" per se is in question, the dangerousness consideration still influences whether an alien is eligible for asylum. However, where the crime is not per se serious and the BIA fails to consider the fourth *Frentescu* factor, the BIA never considers the threat posed by the alien. The Second Circuit in *Ahmetovic* did not go so far as to permit the BIA to wholly disregard dangerousness. In the absence of such specific direction, and in order to avoid an interpretation that renders terms

of the statute superfluous, the court concludes that the BIA must consider whether the circumstances of the crime indicate that the alien will be a danger to the community.

 If an agency decision fails to adhere to the statute, the decision is arbitrary and capricious. *See Yousefi*, 260 F.3d at 329 ("An agency decision 'would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider [or has] entirely failed to consider an important aspect of the problem.'") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The court "cannot defer to an agency decision that is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Id.* (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *see also Michel v. INS*, 206 F.3d 253, 260 (2d Cir.2000) ("We have held, in post-Chevron cases, that the BIA is entitled to deference when interpreting other provisions of the Immigration and Nationality Act, as long as those interpretations are reasonable.").

Second, the BIA applied the wrong standard in determining whether Steinhouse's crime was particularly serious. The fourth *Frentescu* factor has traditionally been regarded as the most important consideration in determining whether a crime is particularly serious. The BIA's failure to consider the fourth *Frentescu* factor constitutes an unjustified deviation from the standard applied in prior BIA cases. *See Yousefi*, 260 F.3d at 330 ("Because the Board failed to consider the two most important *Frentescu* factors and relied on improper considerations, we conclude that the Board's decision was arbitrary and capricious.").

The proposition that the dangerousness factor can be dropped is based on a misinterpretation of the causal connection between the "particularly serious" clause and the "danger to the community" clause. Courts have often stated that an alien is necessarily dangerous if the crime is particularly serious. This causal relationship does not arise because dangerousness need not be considered. Rather, because danger to the community was already a *Frentescu* factor for determining whether a crime was particularly serious, the courts found it duplicitous to then ask whether the individual was a danger to the community, as the text of 8 U.S.C. § 1231(b)(3)(B)(ii) appears to require. *See Ahmetovic*, 62 F.3d at 52 ("The BIA has long held that the determination of whether an alien poses a danger to the community is subsumed within the analysis of whether the crime is 'particularly serious.'") (citations omitted); *Sik Sze Yan v. Slattery*, No. 94 Civ. 2131, 1994 WL 323661, **2–3, 1994 U.S. Dist. LEXIS 9032, at *6–7 (S.D.N.Y. July 5, 1994) ("Every circuit that has interpreted that provision has held that once it is determined that an alien has been convicted of a particularly serious crime, there is no need for an independent determination that he poses a danger to the community. These circuits held that, under the plain language of the statute and Congress' intent, the question of danger to the community is subsumed in the criminal conviction.") (citations omitted). Therefore, the courts have not required an additional, separate dangerousness inquiry; once an alien's crime is determined to be particularly serious, it necessarily follows that they are a danger to the community.

The BIA appears to have misinterpreted these statements regarding the causal relationship to mean that it need not consider the fourth *Frentescu* factor in determining whether a non-per se crime is par-

ticularly serious. The court can find no sufficient justification for the BIA to now abandon the fourth *Frentescu* factor, particularly when it is recognized as the most important.

▪ Third, a decision to require consideration of the dangerousness is consistent with the purposes of the asylum provisions.[5] The United States' obligations under the 1967 Protocol Relating to the Status of Refugees require that the courts make individual assessments in determining whether an individual constitutes a danger to the community.

In sum, because the Second Circuit's decision in *Ahmetovic* addressed a crime that is "particularly serious" per se, *Ahmetovic* is distinguishable. Following the Fourth Circuit's reasoning in *Yousefi*, the court concludes that, because the BIA failed to consider whether the circumstances of Steinhouse's crime indicate that she would be a danger to the community,

---

5. The purpose of the particularly serious crime exception is to preserve the safety and security of United States citizens. Article 33 of the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (Apr. 22, 1954), states that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." However, "[t]he benefit of the present provision may not ... be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."

Similarly, Article 3 of the 1967 Protocol Relating to the Status of Refugees provides that "[n]o person referred to in article 1, paragraph 1, shall be subjected to measures such as rejection at the frontier or, if he has already entered the territory in which he seeks asylum, expulsion or compulsory return to any State where he may be subjected to persecution." However, "[e]xception may be made to the foregoing principle only for overriding reasons of national security or in order to safeguard the population, as in the case of a mass influx or persons."

The purpose of 8 U.S.C. § 1252(b)(3) is to codify these treaty obligations. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 436–37, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("If one thing is clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United States acceded in 1968."); *In re S–S–*, 1999 BIA Lexis 1 at * 12–13 (Congress "expressly amended section 243(h) of the Act to provide the Attorney General discretionary authority to override the categorical bar that designated every aggravated felony a particularly serious crime, if she determined it necessary to do so in order to comply with our nonrefoulement obligation under the Protocol."); *id.* at * 8–9 ("We recognize that the 'particularly serious crime' exception to our obligation to protect those who face or have suffered mistreatment on account of one of the bases contained in the refugee definition is appropriately invoked when extending such protection would threaten the safety and security of our own citizens. According to the Handbook [on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees], while the United Nations Protocol Relating to the Status of Refugees, ... (entered into force Oct. 4, 1967; for United States Nov. 1, 1968) ..., does not require signatory states to tolerate nonnationals who represent a security risk or a danger to the community, it contemplates that a signatory state will make an *individual assessment within the context of the state's legal system, including the consideration of mitigating and aggravating circumstances, in determining whether the individual refugee constitutes a danger to the community.*") (citing Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, ¶¶ 154, 155, 157, at 36–37) (Geneva, 1992).

the BIA's decision is arbitrary and capricious.

### d. *The court cannot review factual determinations in a habeas review.*

Steinhouse also argues that the IJ and BIA failed to consider adequately her mental impairment in concluding that her crime was particularly serious. The IJ and BIA did consider her mental impairment, and this court lacks jurisdiction to reweigh that evidence.[6] However, insofar as Steinhouse's mental impairment affects the determination whether she poses a danger to her community, the BIA must still consider that evidence on remand when applying the correct set of *Frentescu* factors.

### CONCLUSION

The BIA applied the incorrect standard for determining whether Steinhouse's crime was particularly serious. Accordingly, Steinhouse's habeas petition is granted and the case is remanded to the BIA to redetermine whether Steinhouse's crime was particularly serious, applying the correct set of *Frentescu* factors. On remand, the BIA should reconsider all *Frentescu* factors, not simply "whether the type and circumstances of the crime indicate that the alien will be a danger to the community," because the factors must be considered in their totality.

The clerk shall enter judgment and close the file.

It is so ordered.

---

**6.** In the present case, it appears that the Board of Immigration Appeals considered Steinhouse's mental impairment in determining that her crime was particularly serious. The BIA opinion states that "[w]hether a crime is particularly serious, depends upon an examination of the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction. To make this determination, the Board looks to the conviction records and sentencing information." Pl. Mem. Ex. C, *In re: Steinhouse*, No. A17 446 017, at 2 (BIA June 11, 2001) (citations omitted).

The BIA then restates the sentence imposed by the IJ and the rationale for the IJ's conclusion that Steinhouse's offense was particularly serious. The BIA notes that "the Immigration Judge considered that the respondent was suffering from diminished capacity as a result of bipolar disorder," yet found that Steinhouse knowingly and willingly committed the crimes. *Id.* The BIA concludes its opinion by stating: "We agree with the Immigration Judge that the underlying facts of her crime as described throughout the record must lead us to the conclusion that the crime the respondent committed was a particularly serious crime. Therefore, we find no reason to disturb the Immigration Judge's decision that the respondent is not eligible for withholding of removal pursuant to section 241(b)(3)." *Id.*

Although the BIA merely summarized and restated the IJ's rationale for finding the crime to be particularly serious, it ultimately stated that it agreed with that rationale. It therefore appears that the BIA did consider whether and/or how Steinhouse's mental impairment affected the seriousness of her crime.